UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUDITH ELLUL,

        Plaintiff,

vs.                         CIVIL NO.:  05-CV-74354-DT

COMMISSIONER OF           HON. ARTHUR J. TARNOW
SOCIAL SECURITY,           MAG. JUDGE WALLACE CAPEL, JR.

        Defendant.

_____/

## REPORT AND RECOMMENDATION

**I.**     **RECOMMENDATION**

It is recommended that the Court grant Plaintiff's Motion for Summary Judgment in part, deny Defendant's Motion for Summary Judgment, and remand this case for proceedings consistent with this Report.

**II.**    **REPORT**

This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits [DIB].  Plaintiff signed her application for benefits on September 27, 2002,[1] alleging that she has been disabled and unable to work since June 1, 2000, due to arthritis in her knees, one surgery on her left knee, two surgeries on her right knee, carpal tunnel in her right hand, and headaches caused by high blood pressure.  (TR 57, 104).  The Social Security Administration [SSA] denied benefits initially on December 18, 2002.  (TR 38-42).

---

[1] Her application also includes the dates September 26, 2002 and September 30, 2002.  (TR 55).  She filed a previous application in February 2001.  (TR 51-53).  The previous application was initially denied April 5, 2001.  (TR 33-37).

1

A de novo hearing was held on August 17, 2004, before Administrative Law Judge [ALJ] B. Lloyd Blair. (TR 265-89). In a decision dated October 28, 2004, the ALJ found that Plaintiff could perform some light work. (TR 17-26). Accordingly, Plaintiff was found not disabled. (TR 26). On September 23, 2005, the Appeals Council denied review, making the ALJ's decision the final decision of the commissioner. (TR 5-7). Plaintiff then made this appeal to Federal District Court.

## A.   **PLAINTIFF'S TESTIMONY**

Plaintiff testified that she was born February 2, 1963, and was forty-one at the time of the hearing. (TR 269). She reported that she is five feet, eight inches tall, and weighs two hundred and twenty-eight pounds. Id. She has a driver's license. Id.

Plaintiff completed the eleventh grade and obtained her GED thereafter. (TR 270). She last worked full-time at Ironworkers' Local 25, spending eight hours a day on her feet and lifting seventy to one hundred pounds. Id. She worked there for twelve years, and prior to that she worked for one and a half years at Cadillac Asphalt as a flagger. Id. As a flagger, she spent eight hours on her feet , but did not have to lift anything. (TR 271).

Previously, Plaintiff stated that she worked at various plastic companies for two or three months at a time. Id. She explained that one job required her to take milk jugs off a line and pack them. Id. Another job required her to take car parts out of a machine as it stamped the parts. Id. Plaintiff testified that she has not worked since June 1, 2000. Id.

Plaintiff stated that the following impairments prevent her from working: carpal tunnel in her wrists, as well as problems with her knees, neck, and back. (TR 271-272). She was diagnosed with carpal tunnel in the early 1990s, but declined to have surgery, because she was a single parent and would have had to quit her job. (TR 272). She stated that she wears splints all the time. Id.

She stated that she has pain and numbness in her wrists when she writes out checks, drives, or holds her hands above her head. (TR 278). She stated that as long as she keeps her hands down and doesn't use them, she is "fine." Id. She stated that she uses her home computer about once a week, but cannot use the keyboard, only the mouse. (TR 278-79). She has to slide coins to pick them up off a table, and she can only use large buttons, not small. (TR 279). She stated that in terms of tying shoes, she tries to buy shoes that she can slip on. Id.

Plaintiff reported that her problems with her left knee started in 1997, and she had arthroscopic surgery. (TR 272). Problems with her right knee began in the early 1990s, but in 2000, it started to affect her work, and she has since had two surgeries. (TR 272-73). Her most recent surgery was in the February or March of 2001. (TR 273). However, the surgery did not help. Id. She was told that she needs knee replacement, but is too old. (TR 280). She stated that she has had Synvisc injections, but they made her knee worse. Id. She had cortisone injections, which relieved the pain, but now it causes problems when she walks, and she feels "like the bones are slipping apart." Id.

Plaintiff testified that she has been having neck problems for some time, but attributed it to the way she walked. (TR 273). When she went to her chiropractor, he took x-rays, which revealed that the vertebrae in her neck do not curve properly. Id. She stated that she does not treat with anyone else for her neck and no one has suggested surgery. Id. She has seen the chiropractor for six months and continues to treat with him twice a week. (TR 273-74).

She also sees the chiropractor for her back problems, which began when she started having knee surgery. (TR 274). She does not have physical therapy or treat with any one other than the chiropractor for her back. Id. No one has suggested back surgery. Id.

Plaintiff stated that her back pain is on her belt line and below. (TR 275). She stated that if she sits for a while, the pain stays. Id. The pain goes across her back, from one side to the other. Id. When asked if she takes medication for her back, she reported that she is on Vioxx for her knees and does not want to mix medications. (TR 275-76). She stated that she has taken Vioxx for seven months, which causes her to vomit as a side-effect. (TR 276). She has also taken Lortab, but only "when it's absolutely necessary," to avoid taking two painkillers at once. (TR 283).

Plaintiff stated that she saw Dr. Czarnecki, a licensed psychologist (TR 257), one time prior to the hearing. (TR 274). She has not been prescribed any medications by a psychiatrist and does not have any other appointments to see Dr. Czarnecki. (TR 274-75).

He did not suggest further treatment, but she reported she does not "like seeing psychologists." (TR 281-82). She stated that she has suffered from depression since her knee problems began and she lost her job. (TR 282). She stated that she has crying spells for no reason. Id. She reported that she does not have any of her own friends, but does not have problems with her family. Id.

She stated that she has a loss of interest in activities because she is no longer able to do them. Id. She has trouble remembering what day of the week it is and she has to make a list of doctors' appointments. (TR 283). If she does not write something down, she will forget, whereas previously she had no trouble with her memory. Id. She occasionally reads the newspaper, but not often, because she loses track of what she reads. Id.

Plaintiff reported that she has not been hospitalized in the last twelve months, but she has been to the emergency room for left chest pain and right arm immobility. (TR 275). She stated that it was about six months before the hearing and was told it was muscles in her neck causing the pain;

4

thus, she started treating with the chiropractor.  Id.  On a scale of one to ten, with ten being pain that would require immediate medical treatment, Plaintiff rated her pain as follows: neck pain, eight, and back pain, nine.  Id.

Later, she stated that the pain in her right knee on average is a ten and the pain in her left knee is an eight.  (TR 279).  She explained that as the day progresses, her pain worsens the more she stands up and sits down.  Id.  She reported that she tries to alleviate the pain during the day by icing her knee a couple times, usually at eleven in the morning, and five in the evening.  Id.  This "takes the edge off for a while."  Id.

Plaintiff testified that she usually goes to bed at about ten in the evening and she wakes up at six in the morning.  (TR 276).  Plaintiff stated on a typical day, she takes a shower and sits, lays on the couch, or stands up.  Id.  She stated that she gets up to go to the bathroom, but otherwise, she does not "have much of a day."  Id.  She does not cook, but she does laundry, and vacuums.  (TR 276, 281).  However, she does not carry baskets of laundry.  (TR 281).  She can vacuum one room, but then she has to sit for twenty minutes.  Id.  She does not do yardwork, but shops with her husband for groceries.  (TR 276, 280).  She shops "about once every month and a half," and she pushes the cart so that she can lean on it.  (TR 280-81).

Plaintiff stated that she has to bend at the waist to pick things up.  (TR 277).  She cannot squat, but she can climb stairs.  Id.  She stated that she has one flight of stairs at home, with about ten steps.  (TR 278).  She stated that she uses the handrail, and she only goes down the stairs and back up once per day.  (TR 280).

She stated that she could lift about ten to fifteen pounds, and stand on her own about ten to fifteen minutes. (TR 278).  She estimated that she could only walk about a quarter of a block.  Id.

She can sit ten or twenty minutes.  Id.  She stated that she used to have hobbies, but she is not a member of any church, club, groups, or other organization.  (TR 276-77).  She reported that she watches television.  (TR 277).  Plaintiff reported that she visits her mother about once a week.  Id. She spends most of her day on the couch, either propping her feet up or lying down with a pillow between her knees.  (TR 281).

### B.    MEDICAL EVIDENCE

Examination of the parties' cross-motions for summary judgment reveals that an additional recitation of the Plaintiff's medical evidence would be repetitive.  The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[2]

### C.    VOCATIONAL EXPERT'S TESTIMONY

Sandra Steele, a vocational expert [VE], testified at the hearing.  (TR 283-88).  She classified Plaintiff's past work as follows: ironworker, skilled and heavy; and flagger, unskilled and light.  (TR 285).  The ALJ presented a hypothetical question to the VE, which

> assume[d] a hypothetical individual, who can meet the demands of light work. Should never use ladders, scaffolds, or rope, should never kneel or crawl, should only occasionally use ramps or stairs, stoop or crouch.  Should avoid exposure to vibrations, including the use of vibrating pneumatic torque or power tools.  Should avoid working at unprotected heights.  Who may do frequent but not constant fingering and handling with the right upper extremity, but should not have to handle objects smaller than a child's marble, and who requires a sit/stand option.

(TR 285-86).  The VE testified that under these limitations, Plaintiff would not be able to perform her past relevant work.  (TR 286).  The ALJ asked whether there would be any other work available under the hypothetical for an individual with Plaintiff's age, education, and work history.  Id.

---

[2]Subpart E, infra, at 8.

The VE testified that the following light jobs existed: cashier, 17,000 positions; and parking lot attendant or self-serve car wash attendant, 3,000 positions.  Id.  Further, the VE stated that the following sedentary jobs also existed under the hypothetical: referral clerk or information clerk, 3,500 positions; security system or surveillance monitor, 3,000 positions; and cashier, 7,500 positions.  (TR 286-87).

The VE testified that her testimony was consistent with the Dictionary of Occupational Titles [DOT], with the exceptions that "[t]he DOT does not contain a good description of the job, surveillance system monitor or security monitor, as it is performed in today's labor market.  The DOT also does not address sit/stand option as a vocational factor, nor does it give the numbers of jobs for any particular region."  (TR 287).  The VE testified that she relied on "[r]eports that are published by the Michigan Department of Labor, by the Federal Department of Census, information cited in the Michigan Occupational Employment Statistics Manual, as well as [her] familiarity and experience with the Michigan labor market," in giving her testimony.  Id.

The ALJ then asked the VE another hypothetical assuming Plaintiff's testimony at the hearing was entirely credible.  Id.  The Ve testified that there would be no jobs for Plaintiff under that assumption.  (TR 287-88).

Plaintiff's counsel then questioned the VE.  (TR 288).  Plaintiff's counsel asked the VE if she was familiar with the Global Assessment Functioning [GAF] Scale.  Id.  The VE answered in the affirmative.  Id.  Plaintiff's counsel asked whether a person with a GAF of forty could maintain full-time employment.  Id.  The VE testified that

> the GAF is the rater's assessment of that person's functioning on that particular day. That is indicative of, I think, symptoms in the serious to severe range and rating scale, which is all I can really reference, indicates that a person would be expected to have severe problems or be incapable of functioning in a work environment.

7

Id.  Plaintiff's counsel then asked the VE to assume the following, taken from a questionnaire completed by Evan Farez, submitted on the day of the hearing: "an individual that 'has a moderately severe level of pain, which is defined as an impairment which seriously affects the ability to function, and has pain constantly, which interferes with his or her ability to maintain attention and concentration sufficient to complete tasks in a timely manner.'"  Id.  The VE testified that such an individual would not be able to perform competitive work.  Id.

### D.   ALJ'S CONCLUSIONS

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that Plaintiff has the following "severe" impairment, alone or in combination: "degenerative joint disease of the bilateral knees, status post arthroscopic surgeries; right carpal tunnel syndrome; history of high blood pressure," but that she does not have an impairment or combination of impairments as set forth in Appendix 1, Subpart P, Regulations No. 4.  (TR 20, 21, 25).  The ALJ found Plaintiff's testimony not to be totally credible.  (TR 22-23).  He determined that Plaintiff had the RFC to perform some light work.  (TR 23, 25).  Thus, the ALJ concluded that Plaintiff is not eligible for disability.  (TR 26).

### E.   ANALYSIS

Plaintiff advances several claims in her Motion for Summary Judgment.  Plaintiff's Motion argues that the ALJ's decision is not supported by substantial record evidence because (1) the ALJ failed to find her depression and anxiety "severe;" (2) the ALJ failed to properly assess her obesity pursuant to SSR 02-01p; (3) the ALJ erred in assessing credibility; (4) the ALJ failed to properly assess the opinions of her treating physicians; and (5) Plaintiff therefore requests a Sentence Six

Remand.[3]  In response, Defendant's Motion for Summary Judgment contends that these aspects of the ALJ's decision are supported by substantial evidence.[4]  The matter is now ready for decision.

### 1.    Standard of Review

This Court's review of the ALJ's conclusions is limited.  The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g) (1997).  Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  It is more than a scintilla of evidence, but less than a preponderance of evidence.  <u>Brainard v. Sec'y of Health and Human Servs.</u>, 889 F.2d 679, 681 (6th Cir. 1989).  This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed.  <u>Felisky v. Bowen</u>, 35 F.3d 1027, 1035 (6th Cir. 1994).  Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence.  <u>Mullen v. Bowen</u>, 800 F.2d 535, 545 (6th Cir. 1986).  Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted.  <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998).  Applying these standards, I will analyze each of Plaintiff's claims.

### a.    Depression and Anxiety

_____

[3]Plaintiff's Motion for Summary Judgment and Brief filed August 2, 2006, (hereinafter "Plaintiff's Brief") at pages 8-16.

[4]Defendant's Motion for Summary Judgment and Brief filed September 11, 2006, (hereinafter "Defendant's Brief") at pages 9-20.

Plaintiff argues that the ALJ improperly rejected Dr. Czarnecki's findings and should have found Plaintiff's depression and anxiety to be "severe" impairments.[5] <u>Farris v. Sec'y of Health and Human Servs.</u>, 773 F.2d 85, 90 (6th Cir. 1985) defines an impairment that is not severe as a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience." Nevertheless, if the ALJ considers the impairment past Step 2, it is irrelevant whether it was severe. <u>Hamilton v. Sec'y of Health & Human Servs.</u>, 991 F.2d 795, 1993 WL 106845, at *6 (6th Cir. 1993). <u>See also</u> <u>Maziarz v. Sec'y of Health & Human Servs.</u>, 837 F.2d 240, 244 (6th Cir. 1987) ("[s]ince the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error.").

Coincidentally, when <u>Farris</u> was being decided, the Secretary

issued an interpretive ruling, SSR 85-28, in which the agency clarified its implementation of 20 C.F.R. § 404.1520(c) in light of several court decisions. The ruling emphasized that an impairment was to be found not severe only when medical evidence established a slight abnormality or combination thereof which would have no more than a minimal effect on a claimant's ability to work even if the individual's age, education, or work experience were specifically considered.

<u>Salyers v. Sec'y of Health and Human Servs.</u>,  798 F.2d 897, 901 (6th Cir. 1986).

The only evidence before the ALJ of Plaintiff's depression and anxiety was the consultative examination with E. Czarnecki, Ph.D.  The ALJ reviewed same and stated,

On July 28, 2004, the claimant was evaluated by E. Czarnecki, Ph.D.  Based on this one-time evaluation meeting, Dr. Czarnecki indicated that in light of the claimant's presentation and MMPI-2 profile, "she is so labile, depressed, despondent, insecure

---

[5]Plaintiff's Brief at page 8.

and anxious that it unlikely (sic) that she could sustain a routine of even simple work activity. Her concentration, attention, energy and interest levels are poor. Her social adaptation is significantly impaired by her threatened sense of security and deteriorated self-esteem. Her tolerance for social interaction and even superficial levels of co-worker interaction and supervisory feedback is poor. Her ability to adapt to even simple changes in routine is severely limited. It is unlikely that (the claimant) could sustain a routine of even simple unskilled work activity or tolerate even low stress social demands." Dr. Czarnecki diagnosed the claimant with depressive, anxiety and personality disorders, and ascribed a global assessment of functioning (GAF) score of 40 to the claimant's overall condition. Such a rating, as defined in <u>DSM-IV</u>, denotes major impairment in various functional areas (Exhibit 12F).

It appears that this evaluation, which took place just three weeks before her hearing date, was performed not to seek treatment, but rather, in connection with an effort to generate evidence for the current appeal. Such evidence s legitimate and deserves due consideration regardless of who arranged it. However, the rather extraordinary conclusions of Dr. Czarnecki are not adopted, as they are inconsistent with a preponderance of evidence. The claimant averred a disability of over four years' duration. During that interval, the claimant was not psychiatrically hospitalized. Furthermore, she did not seek or participate in counseling or other psychotherapeutic modalities. When she petitioned for benefits, the claimant did not allege suffering from emotional or psychological disorders. No physician who evaluated the claimant during the period at issue listed abnormal findings affiliated with the claimant's mood, general mentation, or cognitive functions. In terms of limitations stemming form her mental status, the claimant has "no" restrictions in activities of daily living (performs adaptive functions such as cleaning, shopping, caring appropriately for personal grooming and hygiene); "mild" difficulties in maintaining social functioning (communicates and interacts adequately with others, functions in social setting e.g., store clerks, has meaningful interpersonal relationships with family and a few friends); and "mild" deficiencies of concentration, persistence or pace in completing tasks in a timely manner (operates a motor vehicle, no persistent cognitive dysfunction documented in terms of awareness, orientation, memories, fund of knowledge, ro calculations). There are "no" episodes of decompensation in a work or work-like setting.

In view of these circumstances, it is determined that the evidence in the record does not establish the existence of a medically determinable "severe" mental impairment, and clearly none that has lasted, or is expected to last for a period of 12 consecutive months.

(TR 21). E. Czarnecki, Ph.D. was a one-time examiner, not entitled to deference as a treating physician, and the ALJ gave reasons for discrediting him. Thus, there is no error in the ALJ's

treatment of same.   Plaintiff has also submitted additional evidence of her psychological impairments.  This evidence will be more fully discussed below.[6]

### b.    Obesity

Plaintiff argues that the ALJ failed to address Social Security Ruling (SSR) 02-01p and evaluate her obesity.[7]  This Court recognizes that obesity can cause a person to be disabled, especially when in concert with other factors.  <u>Johnson v. Sec'y of Health and Human Servs.</u>, 794 F.2d 1106, 1112-14 (6th Cir. 1986).

SSR 02-01p states that "we will not make assumptions about the severity or functional effects of obesity combined with other impairments" and  recognizes that "[o]besity in combination with another impairment *may or may not* increase the severity or functional limitations of the other impairment. (emphasis added).  We will evaluate each case based on the information in the case record."  2001 WL 628049, at * 6 (S.S.A. 2002).

Plaintiff argues that her obesity should have been evaluated with her combined knee problems, carpal tunnel, and depression.[8]   "In evaluating the evidence regarding appellant's impairments we note that in this circuit they must be viewed in combination." <u>Mowery v. Heckler</u>, 771 F.2d 966, 971 (6th Cir. 1985).  Further, "[d]isability may be established by a claimant suffering from a variety of medical problems no one of which might be sufficiently disabling to prevent substantial gainful employment, but when taken together have that result."  <u>Id.</u>  (citing <u>Hurst v. Schweiker</u>, 725 F.2d 53 (6th Cir.1984); <u>Allen v. Califano</u>, 613 F.2d 139 (6th Cir.1980)).  In addition,

---

[6]See <u>infra</u>, at 23-24.

[7]Plaintiff's Brief at pages 9-11.

[8]Plaintiff's Brief at page 11.

"[w]hen multiple impairments are involved, the assessment of RFC reflects the restrictions resulting from all impairments (both severe and not severe impairments). This assessment is based on all relevant evidence pertaining to RFC consistent with appropriate clinical and laboratory findings," according to SSR 86-8, 1986 WL 68636, at *5 (S.S.A. 1986).

Further, in Cranfield v. Commissioner of Social Security, 79 Fed. Appx. 852, 857, 2003 WL 22506409, at * 5 (6th Cir. 2003), "[t]he ALJ did nothing more than mention [Plaintiff]'s obesity because neither [Plaintiff] nor her doctors offered any evidence to suggest that her weight was a significant impairment." Specifically, the court held, albeit in an unpublished decision, that "[t]he problem with this argument is the ALJ never received evidence suggesting [Plaintiff] or her doctors regarded her weight as an impairment," and did not meet the requirements of 20 C.F.R. § 404.1512(a), "[t]hus, the ALJ and the district court had no obligation to address [her] obesity." Id. at 857-58.

Similarly, in the present case, Plaintiff presents no such evidence. She only suggests that because she has an impairment of the musculoskeletal system, that her obesity under SSR 02-01p is a "risk factor."[9] A thorough review of the records also fails to show that her doctors found her obesity to be an impairment.[10] Dr. Lederman mentioned her weight in September 2000, among other things, and he restricted her from lifting, climbing, and squatting. (TR 163, 165).[11] Her weight is mentioned by Dr. Goldman in November 2000. (TR 195).[12] The doctor states

---

[9]Plaintiff's Brief at page 10.

[10]See Defendant's Brief at page 14.

[11]See also Defendant's Brief at page 14.

[12]See also Defendant's Brief at page 14.

Mrs. Ellul is 5'8" tall and weighs 220 pounds. She has a significant limp favoring the right lower extremity and she uses a cane for support in her right hand. She has marked atrophy of the right quadriceps. She has a normal neurologic exam in the lower extremity. Her right hip goes through a full, pain-free range of motion. She can actively extend the right knee fully, but can flex only to 120°. Her left knee goes through a full, stable range of motion. The right knee is not particularly warm or swollen and there are well-healed scars from her surgical procedure.

Id. Dr. Goldman concluded that "[s]he is unable to work and may require further arthroscopic intervention." Id. Weight gain is mentioned on consultation by M. Wood, M.D. with the FIA on November 26, 2002. (TR 208). However, Dr. Wood stated on that same date that "[s]he was obese, well built and well nourished, and did not appear acutely ill or in any acute distress. She was ambulatory with no assistance device." (TR 209).[13] Dr. Czarnecki also mentioned that she was obese. (TR 255). The ALJ mentioned Dr. Wood's finding regarding obesity, but no impairments were mentioned relating to same.[14] (TR 20). Thus, Plaintiff has failed to show and the records fail to disclose an impairment related to obesity or involving same with her other impairments. Thus, the ALJ did not err in this regard.

### c.      Credibility

Plaintiff also argues that the ALJ failed to properly evaluate her credibility.[15] In evaluating subjective complaints of disabling pain, this court looks to see whether there is objective medical evidence of an underlying medical condition, and if so then: 1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or, 2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the

---

[13]See also Defendant's Brief at page 14.

[14]Defendant's Brief at page 14.

[15]Plaintiff's Brief at pages 11-13.

alleged disabling pain.  McCoy on Behalf of McCoy v. Chater,  81 F.3d 44, 47 (6th Cir. 1995)

(quoting  Stanley v. Sec'y of Health and Human Servs., 39 F.3d 115, 117 (6th Cir.1994) (citing

Jones v. Sec'y of Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir.1991) and quoting Duncan

v. Sec'y of Health and Human Servs., 801 F.2d 847, 853 (6th Cir.1986))).  In order to determine

disability based on subjective complaints, we look to 20 CFR § 404.1529(c)(3):

> When determining credibility, in addition to the objective medical evidence, the ALJ must also consider:
> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 minutes to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

"However, we will not reject your statements about the intensity and persistence of your pain or

other symptoms or about the effect your symptoms have on your ability to work solely because the

available objective medical evidence does not substantiate your statements."   20 CFR §

404.1529(c)(2).   Further, as Social Security Ruling (SSR) 96-7p points out, the ALJ's

"determination or decision must contain specific reasons for the finding on credibility . . . to make

clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the

individual's statements and the reasons for that weight." 1996 WL 374186, at *4 (S.S.A. 1996).

In the present case, the ALJ has stated,

> In determining the claimant's residual functional capacity, attention has been given to her allegations and subjective complaints of pain and other allegedly disabling symptoms, according to the guidelines set forth in section 404.1529 of the

15

Regulations and Social Security Ruling 96-7p. The claimant's statements about pain and other symptoms will not alone establish disability. The Administrative Law Judge must consider all of the claimant's symptoms, including pain, and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence, medical treatment history, information form other sources and the findings of impairments. The undersigned considered the nature, location, onset, duration, frequency, radiation, and intensity of the claimant's pain and other symptoms. Consideration has also been given to the participating or aggravating factors, type of medication, dosage, effectiveness and side effects, as well as the type of treatment, and other matters relating to the claimant's condition. . . .

The undersigned considered whether the claimant's medically determinable impairments could reasonably be expected to cause the disabling symptomology alleged and concluded that they could. However, after careful consideration of the entire record, the undersigned finds that the claimant's testimony, with respect to the extent and severity of her impairment alleged and concluded that they could. However, after careful consideration of the entire record, the undersigned finds that the claimant's testimony, with respect to the extent and severity of her impairment and the resulting functional limitations, to be somewhat overstated and inconsistent with the available evidence.

Specifically, for good portions of the period at issue, the claimant did not participate in regular medical care for her allegedly disabling health concerns. It was suggested that financial constraints limited the claimant's treatment options. This may be true to some degree, however, the claimant was able to fund a chronic smoking habit. In any event, the undersigned notes the results of MRI, radiographic and clinical evaluations which do not uncover totally debilitating pathology. While the claimant has serous knee disorders, she maintains reasonably good lower limb mobility, stability, power and vascular status, as well as adequate ambulation. The evidence does not substantiate the claimant's contention that she needs to lie down and/or prop her knees up for extended intervals on most days . . .

Though limited to some degree, within testimony or [sic] the written record, it was reported that the claimant is able to perform self-care tasks and other activities. The claimant prepares meals, washes dishes and laundry. At a measured pace, the claimant vacuums and mops floors. Further, the claimant drives for short distances, goes shopping with others, visits with friends and regularly with her mother. Moreover, the claimant spends time reading, watching television and listening to the radio (Exhibits 6E, 3F and testimony).

(TR 22-23).

16

Plaintiff argues that the ALJ's credibility analysis was incorrect because he mischaracterized Plaintiff's daily activities.[16]  Specifically, Plaintiff alleges that she does not fix meals.[17]  This was also her testimony.  (TR 276).  Further, she argues that the ALJ improperly implies that she shops with others on a regular basis, but she reported that she only shops once a month, for an "hour at most."[18]  This is consistent with her testimony.  (TR 280).  Additionally, Plaintiff points out that the ALJ said she could read, but she reported that she does not read.[19]  However, Plaintiff testified that the hearing that she occasionally reads the newspaper.  (TR 283).  Nonetheless, even though she did testify that she reads the newspaper at times, she also stated that she loses track of what she reads.  Id.

The ALJ alleges that he relied on the "Pain/Daily Activities Questionnaire" and the hearing testimony in assessing credibility.  (TR 23).  The ALJ also stated that he relied on Exhibit 3F, which is Dr. Lederman's assessment that reports Plaintiff's daily activities as follows: "Ms. Ellul does some housecleaning, driving, and grocery shopping, but she does get help from her husband and daughter."  (TR 161).

Obviously, the ALJ made errors regarding Plaintiff's ability to prepare meals.  However, Plaintiff's assertions regarding the ability to shop and read are based on implications by Plaintiff.  The three factors mentioned by Plaintiff were not the sole basis for the ALJ's credibility findings.  Plaintiff does also argue that the ALJ failed to discuss her need to elevate her legs and her need to

---

[16]Plaintiff's Brief at page 12.

[17]Plaintiff's Brief at page 12 (citing TR 23, 124).

[18]Id.

[19]Plaintiff's Brief at page 12 (citing TR 125).

lie down during the day.[20]  However, the ALJ did state, as mentioned above, that "[t]he evidence

does not substantiate the claimant's contention that she needs to lie down and/or prop her knees up

for extended intervals on most days."  (TR 22).  Thus, Plaintiff is mistaken.

> The ALJ extensively stated his reasons for rejecting her credibility and so stated.
>
> The ALJ may have been wrong, but he was not unclear; after listening to what [Plaintiff] said on the witness stand, observing his demeanor, and evaluating that testimony in the light of what appears in the written medical records, the ALJ concluded, rightly or wrongly, that [Plaintiff] was trying to make his symptoms and functional limitations sound more severe than they actually were.  It is the ALJ's job to make precisely that kind of judgment.

Gooch v. Sec'y of Health and Human Servs., 833 F.2d 589, 592 (6th Cir. 1987).  The "ALJ's

findings based on the credibility of the applicant are to be accorded great weight and deference . .

." and should not be disturbed.  Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997)

(citation omitted).  The ALJ's decision was based on substantial evidence; thus, this Court cannot

challenge that finding.  Williamson v. Sec'y of Health and Human Servs., 796 F.2d 146, 150 (6th

Cir. 1986) (citations omitted) (the ALJ expressly found claimant's testimony not worthy of credit,

and such credibility determinations ordinarily are given deference by the court).

### d.   Treating Physicians

Plaintiff argues that the ALJ failed to defer to the opinions of her treating physicians, Dr.

Pevzner, Dr. Farres, and Dr. Wood.[21]  This Court is well aware that the medical opinions and

diagnoses of treating physicians are entitled to substantial deference, particularly if those opinions

are uncontradicted.  King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984).

The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of

---

[20]Plaintiff's Brief at page 12.

[21]Plaintiff's Brief at pages 13-14.

18

time will have a deeper insight into the medical condition of the claimant than will
a person who has examined a claimant but once, or who has only seen the claimant's
medical records.

Bankston v. Comm'r of Soc. Sec., 127 F. Supp. 2d 820, 824 (E.D. Mich. 2000).  However, such

deference is due only if the treating physician's opinion is based on sufficient medical data.  See 20

C.F.R. § 404.1529.  The determination of disability is the prerogative of the Secretary, and not the

treating physician.  Kirk v. Sec'y Of Health & Human Servs., 667 F.2d 524, 538 (6th Cir. 1981);

Duncan, 801 F.2d at 855; 20 C.F.R. § 404.1527.

An ALJ may reject a physician's opinion when it is brief, conclusory, or not supported by

medically acceptable clinical or laboratory diagnosis techniques.  20 C.F.R. § 404.1527(d)(2).

Accordingly, treating physicians' opinions must be grounded on objective medical evidence, and

no deference need be afforded those opinions if they are simply conclusory.  Houston v. Sec'y of

Health and Human Servs., 736 F.2d 365, 367 (6th Cir. 1984); Duncan, 801 F.2d at 855 (citing King,

742 F.2d at 973).  In other words, the weight to be given a doctor's opinion by an ALJ will depend

on the extent to which it is supported by "specific and complete clinical findings."  Giddings v.

Richardson, 480 F.2d 652, 656 (6th Cir. 1973).  See also  Cutlip v. Sec'y of Health and Human

Servs., 25 F.3d 284, 287 (6th Cir. 1994) (citing Young v. Sec'y of Health & Human Servs., 925 F.2d

146, 151 (6th Cir. 1990)).

In Wilson v. Commr. of Soc. Sec., 378 F.3d 541, 544, (6th Cir. 2004), the Sixth Circuit

found that

[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must
apply certain factors--namely, the length of the treatment relationship and the
frequency of examination, the nature and extent of the treatment relationship,
supportability of the opinion, consistency of the opinion with the record as a whole,
and the specialization of the treating source--in determining what weight to give the
opinion.

(citations omitted).  The Sixth Circuit went on to state

> [t]hat is not to say that a violation of the procedural requirement of § 1527(d)(2)
> could never constitute harmless error.  We do not decide the question of whether a
> de minimis violation may qualify as harmless error.  For instance, if a treating
> source's opinion is so patently deficient that the Commissioner could not possibly
> credit it, a failure to observe § 1527(d)(2) may not warrant reversal.  <u>NLRB v.</u>
> <u>Wyman-Gordon, Co.</u>, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)
> (plurality opinion) (where "remand would be an idle and useless formality," courts
> are not required to "convert judicial review of agency action into a ping-pong
> game"). There is also the possibility that if the Commissioner adopts the opinion of
> the treating source or makes findings consistent with the opinion, it may be irrelevant
> that the ALJ did not give weight to the treating physician's opinion, and the failure
> to give reasons for not giving such weight is correspondingly irrelevant.  Or perhaps
> a situation could arise where the Commissioner has met the goal of § 1527(d)(2)--
> the provision of the procedural safeguard of reasons--even though she has not
> complied with the terms of the regulation.

<u>Id.</u> at 547.

In the present case, the ALJ gave the following reasons for rejecting Dr. Farres and Dr.

Pevzner's opinion:

> In reaching this conclusion, the undersigned considered the reports and comments
> of Drs. Farres and Pevzner.  In a July 2004 assessment furnished by counsel, Dr.
> Pevzner ascribed limitations to the claimant as a result of her knee condition that
> were incompatible with full-time employment (e.g., claimant can only sit, stand and
> walk a total of 2-3 hours in a workday) (Exhibit 11F).  Though Dr. Pevzner did not
> initially meet the claimant until May 2003, he checked a block indicating that the
> claimant had been so limited since June 1, 2000.  As discussed earlier, various
> examining and treating physicians who evaluated and provided care for the claimant
> during 2000 and later, did not find such serious dysfunction.  Dr. Pevzner's own
> clinical narratives do not reveal profound abnormalities (e.g., mild right knee joint
> line tenderness; some knee pain and stiffness with preserved muscle tone and knee
> motion; no knee swelling evident; lower extremity sensation, power, and reflexes are
> all intact; knee x-rays show only early degenerative changes without loss of joint
> spacing).  As Dr. Pevzner's opinions as to the claimant's functionality are internally
> inconsistent, not well supported objectively, and are inconsistent with other
> substantial evidence in the record, they are accorded limited weight.
> In an August 2004 assessment furnished by counsel, Dr. Farres indicated that the
> claimant's knee pain "constantly" interfered in her ability to maintain attention and
> concentration (Exhibit 14F).  The doctor suggested that the claimant's knee disorder
> required her to elevate her legs for protracted intervals each day and limited her

20

ability to stand, walk and sit. Though Dr. Farres indicated that the claimant's limitations existed since June 1, 2000, he did not first meet the claimant until March 2002. The few progress notes from Dr. Farres disclose no real discussion or formal evaluation of the claimant's knees. Moreover, the doctor's reports contain no mention of attentional or concentration deficits manifested by the claimant. Dr. Farres' views are not adopted by the undersigned, and they are not objectively supported, and are contraindicated by substantial evidence in the record.

(TR 23-24).

Plaintiff also argues that the ALJ should have given more weight to Dr. Pevzner's opinion because his specialty is rheumatology.[22] The ALJ attempted to give good reasons for rejections the opinions of both the doctors. The ALJ did neglect to acknowledged Dr. Pevzner's speciality as required by Wilson, but more troubling to the undersigned is the fact that Dr. Pevzner found that Plaintiff could not stoop. (TR 241). The ALJ neglected to note this finding. Thus, Plaintiff argues that the ALJ did not have substantial evidence that Plaintiff could "occasionally" stoop.[23] Rather, Plaintiff points out that both Dr. Wood and Dr. Pevzner stated that she could not stoop.[24] (TR 214, 241). The ALJ seems to have relied on the State Agency, as Plaintiff mentions, and the State Agency stated that Plaintiff could "occasionally" stoop, contrary to Dr. Wood and Dr. Pevzner.[25] (TR 220, 228).

Plaintiff relies on Allison v. Comm'r of Soc. Sec., 347 F. Supp. 2d 439, 447 (E.D. Mich. 2004), and argues that the ALJ erred in failing to address Plaintiff's complete inability to stoop in the RFC. SSR 83-14 provides in pertinent part:

---

[22]Plaintiff's Brief at page 15.

[23]Plaintiff's Brief at page 14.

[24]Plaintiff's Brief at page 14.

[25]Plaintiff's Brief at page 14.

> Two types of bending must be done frequently (from one-third to two-thirds of the time) in most medium, heavy, and very heavy jobs because of the positions of objects to be lifted, the amounts of weights to be moved, and the required repetitions. They are stooping (bending the body downward and forward by bending the spine at the waist) and crouching (bending the body downward and forward by bending both the legs and spine). However, to perform substantially all of the exertional requirements of most sedentary and light jobs, a person            would not need to crouch and would need to stoop only occasionally (from very little up to one-third of the time, depending on the particular job).

SSR 83-14, 1983 WL 31254, at *2 (S.S.A. 1983). SSR 96-9p also provides as follows, in relevant part:

> An ability to stoop occasionally; i.e., from very little up to one third of the time, is required in most unskilled sedentary occupations. A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work. Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping.

1996 WL 374185, at *8 (S.S.A. 1996)(emphasis added).

Although an ALJ is not required to discuss each and every piece of evidence, he or she "may not pick and choose the portions of a single report, relying on some and ignoring others, without offering some rationale for his decision." Young v. Comm'r of Soc. Sec., 351 F. Supp.2d 644, 649 (E.D. Mich. 2004). Therefore, because the ALJ failed to explain his rationale for finding that Plaintiff could "occasionally" stoop when there was record evidence that she could never stoop, the case should be remanded to explain the reasoning. Without an explanation for the ALJ's finding in this regard, appellate review cannot be meaningful.

### e.    Additional Evidence

22

Plaintiff argues that this case should be remanded pursuant to sentence six of 42 U.S.C. § 405(g).[26]  The Sixth Circuit has held that the Court does not have to review new evidence unless good cause has been shown and the new evidence is material.  Cline v. Comm'r of Social Sec., 96 F.3d 146, 148 (6th Cir. 1996).  In Cline, it was the claimant's

> primary argument... that because the Appeals Council considered his new psychiatric evidence, the district court was required to do so as well.  He is mistaken.  In Cotton v. Sullivan, 2 F.3d 692, 695-96 (6th Cir. 1993), this court decided a case very much like [claimant's], holding that where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.  The district court can, however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding.  Id. at 696.

Id.  "A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  Foster, 279 F.3d at 357 (citing Willis v. Sec'y of Health & Human Servs., 727 F.2d 551, 554 (1984) (per curiam).  In order for the claimant to satisfy his burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.  Sizemore v. Sec'y of Health and  Human Servs., 865 F.2d 709, 711 (6th Cir. 1988) (citing Carroll v. Califano, 619 F.2d 1157, 1162 (6th Cir. 1980)).

Additionally, Plaintiff has to establish "newness" pursuant to Sullivan v. Finkelstein, 496 U.S. 617, 626 (1990) (a sixth sentence remand is only "appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding

---

[26]Plaintiff's Brief at pages 8-9.

that might have changed the outcome of that proceeding.") (citations omitted); see Abbott v. Sullivan, 905 F.2d 918, 925 n.5 (6th Cir. 1990) (citation omitted).

Plaintiff argues that an MRI in March 2002, shows "[b]road base disc bulging, most severe at L4/5 with mild stenosis at this level."[27]  (TR 261). She alleges that this MRI would "assist in substantiating the claimant's testimony relative to the pain she has in her back."[28]  She offers no argument as to the three elements required by Cline.

Plaintiff also argues that she began treatment with Jeffrey Wendt, Ph. D. in January 2005.[29] (TR 262-64).  She explains that in part, due to what she learned from Dr. Czarnecki, she began this treatment.[30]  The treatment notes also reveal that her family urged her to seek treatment in this regard.  (TR 262).

However, even though this may establish good cause and newness, it fails to address the materiality element.  As Defendant argues:

> In any event, the MRI does not indicate significant changes in Plaintiff's condition (Tr. 261).  Moreover, the psychologist's notes reveal that Plaintiff's few counseling sessions resulted in improvement and fewer depressive symptoms (Tr. 262-63). Thus, neither of these records would demonstrate a reasonable probability that the Commissioner would have reached a different disposition of the case. The Court should affirm the Commissioner's decision.[31]

Thus, Plaintiff has failed to meet the requirements for remand under sentence six of 42 U.S.C. § 405(g) relative to the additional evidence submitted to the Appeals Council.

---

[27]Plaintiff's Brief at page 9.

[28]Id.

[29]Plaintiff's Brief at page 8.

[30]Id.

[31]Defendant's Brief at pages 19-20.

2.       **Remand Versus Benefits**

The remaining issue is whether remand or an award of benefits is the appropriate remedy for Plaintiff.  It is firmly established that under 42 U.S.C. § 405(g), a court may remand for an award of benefits "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  <u>Faucher v. Sec'y of Health & Human Servs.</u>, 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted).  More specifically, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking."  <u>Id.</u> (citing <u>Mowery v. Heckler</u>, 771 F.2d 966, 973 (6th Cir. 1985)).

The ALJ did not properly assess Plaintiff's ability to stoop in light of all the evidence; thus, remand to allow the ALJ to properly assess her functional capacity in this respect is necessary, but a remand for benefits in this instance would be premature.

**III.    <u>CONCLUSION</u>**

For the reasons stated, I respectfully recommend that the court **GRANT** Plaintiff's Motion for Summary Judgment **IN PART**, **DENY** Defendant's Motion for Summary Judgment, and **REMAND** this case to the Defendant Commissioner for further proceedings consistent with this Report.

Pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objection within ten days after being served with a copy thereof.  The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals.  <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed. R. Civ. P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.


s/Wallace Capel, Jr.
**WALLACE CAPEL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**Dated:**   November 20, 2006

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on <u>November 20, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  <u>Janet L. Parker and Kenneth F. Laritz,</u>

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>Social Security Administration, Office of the Regional Counsel, 200 W. Adams Street, 30th Floor, Chicago, Illinois 60606</u>.

<div style="margin-left: 50%;">

s/James P. Peltier
United States District Court
Flint, Michigan 48502
810-341-7850
E-mail: pete_peltier@mied.uscourts.gov

</div>

27